UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF FLORIDA
MIAMI DIVISON

**Case No. 1:21-cv-22834-SCOLA/GOODMAN**

BEHAVIOR ANALYST CERTIFICATION
BOARD, INC. and NCS PEARSON, INC.,
d/b/a PEARSON VUE

        Plaintiffs,

v.

EVELYN VERA RODRIGUEZ

        Defendant.

**OMNIBUS REPORT AND RECOMMENDATION ON PLAINTIFFS' MOTIONS
FOR DEFAULT JUDGMENT AND FOR ATTORNEYS' FEES**

In this seven-count theft of trade secrets and breach of contract case, Plaintiffs, the

Behavior Analyst Certification Board, Inc. (the "BACB") and NCS Pearson, Inc., d/b/a

Pearson Vue ("Pearson"), filed a Motion for Default Judgment [ECF No. 17], Motion for

Attorneys' Fees and Costs [ECF No. 34], and Supplemental Motion for Attorneys' Fees

and Costs [ECF No. 36]. Defendant Evelyn Vera Rodriguez has not responded to any of

the motions and the time to do so has passed. All three motions have been referred to the

Undersigned for a Report and Recommendations. [ECF Nos. 18; 35].

For the reasons discussed below, I **respectfully recommend** that the Court **grant**

Plaintiffs' Motion for Default Judgment and award them $144,810.00 in damages. Further,

I **respectfully recommend** that the District Court **grant in part** Plaintiffs' request for

attorneys' fees and award them $33,817.00 ($32,789.36 less than the requested amount).

Finally, I **respectfully recommend** that the District Court **deny** Plaintiffs' request for

costs.

## I.      FACTUAL AND PROCEDURAL BACKGROUND

### A.  *The BACB and Pearson Vue*

According to the Complaint, behavior analysis is the science of behavior, with a

history extending back to the early 20th century. [ECF No. 1, ¶ 1]. Its guiding philosophy

is behaviorism, which is based on the premise that attempts to improve the human

condition through behavior change (e.g., education, behavioral health treatment, etc.)

will be most effective if behavior itself is the primary focus. *Id.*

Plaintiffs explain that behavior analysts generally work with children and young

adults exhibiting challenging behaviors, including aggression and self-injury, and focus

on the root causes of the behavior as a means of modification. *Id.* at ¶ 2. Behavior analysts

also work with individuals on the autism spectrum, aiding with assimilating into

mainstream society. *Id.*

The BACB is a national nonprofit 501(c)(3) corporation established in 1998 to meet

the professional credentialing needs of behavior analysts, governments, insurers, and

consumers of behavior analysis services. [ECF No. 33, p. 5:10-15].[1] As a credentialing

---

[1]      At an evidentiary hearing, Dr. Melissa Nosik, BCBA-D, testified on behalf of the
BACB. Dr. Nosik is the BACB's Deputy Chief Executive Officer. She has been employed
by the BACB for approximately eight years.

organization, the BACB relies on its credibility with consumers and licensing authorities to attract qualified professionals to attain its certifications. [ECF No. 1, ¶ 3].

The certifications issued by the BACB are utilized by regulatory agencies and boards for state licensing purposes, as well as validation of professional qualifications by school districts, other government organizations, and private medical and consulting practices. *Id.* at ¶ 16. The bona fide utilization of the BACB credentials by individual certificants for state licensing is a critical and essential part of the BACB's activities, and the BACB has a protectable interest in maintaining the integrity of these certification processes. *Id.*

The BACB offers three (3) certifications to qualified candidates. [ECF No. 33, p. 5:16-25]. Relevant to this case is the Registered Behavior Technician (RBT) certification, which is BACB's entry-level certification, and requires completion of a mandatory forty-hour training and competency assessment, successful passage of a rigorous examination, compliance with strict ethical obligations, and mandatory annual completion of an additional competency assessment. *Id.* at 7:22-8:11.

The BACB offers its examinations through a third-party vendor, co-plaintiff Pearson. *Id.* at 12:12-19. Pearson is the global leader in delivering high-stakes examinations, including the Medical College Admission Test, the Law School Admissions Test, and numerous other certification tests. *Id.* at 14:8-13.

This case concerns Plaintiffs' allegations that Defendant breached certain confidentiality and ethical obligations required of individuals who take an examination offered by the BACB by misappropriating certain exam questions and then disclosing those questions to other individuals who later took the same examination. [ECF No. 1].

B. *Background of Defendant's Theft*[2]

The BACB develops its certification examinations by having subject matter experts write and review new examination questions and then pilots those questions to ensure statistical validity before scoring those questions on its examinations. [ECF No. 33, pp. 8:19-9:20]. The BACB incurs hundreds of thousands of dollars in costs to develop its examinations. [ECF No. 1, ¶ 18]. Questions are typically used on a rotating basis for several years before being replaced. *Id*.

The BACB's Registered Behavior Technician Handbook contains express Terms and Conditions, to which a candidate for any BACB certification must agree before commencing an examination application. [ECF No. 33, pp. 18:24-19:17]. Relevant Terms and Conditions include:

> You are prohibited from taking materials, documents, notes, or memoranda of any sort from the examination area. YOU ARE PERMANENTLY PROHIBITED FROM EVER DISCLOSING THE CONTENT OF BACB EXAMINATION QUESTIONS. This prohibition includes verbal, written, and/or electronic (e.g. email, chat room, social media) disclosure. BACB

---

[2] This background is derived from the well-pleaded facts of the Complaint [ECF No. 1], which Defendant has admitted by virtue of her default, as well as from the BACB's Deputy Chief Executive Officer, Dr. Melissa Nosik's, evidentiary hearing testimony [ECF No. 33].

examinations and individual questions are copyright protected and highly confidential trade secrets. Any disclosure or reconstruction of test questions and content shall be in violation of BACB rules and subject to damages including, but not limited to, the cost of replacing the compromised question(s) and reconstruction of the examination, if advisable, at the discretion of BACB.

Proctors are authorized to maintain a secure and proper examination administration. You may not communicate with other examinees during the examination. BACB considers unauthorized sharing of examination content with others to be a violation of the copyright and to constitute cheating. Cheating or permitting cheating (such as letting someone copy your answers or providing information on the content of examination questions to others), will be cause for automatic disqualification and dismissal from the examination. Any irregular, disruptive, inappropriate, or suspected cheating behavior by you may result in your relocation or removal from the examination site and/or refusal to release your examination scores. In such event, your examination fees will not be refunded or deferred.

[ECF Nos. 1, ¶ 20; 33, pp. 19:18-21:11].

Additionally, the BACB Registered Behavior Technician Handbook contains an

Examination Security section, which states:

BACB and Pearson VUE take examination security seriously, because the value of your certification and our credibility depend on it. RBT certification examination content is confidential; it is never appropriate to share, discuss, post, or upload exam content. In addition, candidates are required to adhere to the RBT Ethics Code, including 1.03, which includes the following requirement: "RBTs are truthful and honest and create an environment that promotes truthful and honest behavior in others."

Unauthorized possession, reproduction, publication, or disclosure of any BACB examination materials—including storing or disclosing examination questions to any person or entity by any means before, during, or after the examination—is prohibited and can result in program disqualification or other appropriate censure. Examples of violations and misconduct include:

- Submitting false, inconsistent, or misleading statements or omitting information BACB requests
- Attempting to take the examination for someone else or having someone else take the examination for you
- Copying or sharing information, or any other form of cheating
- Obtaining advanced access to examination material
- Stealing examination materials
- Bringing prohibited items into the examination room
- Failing to follow directions from test center staff

[ECF Nos. 1, ¶ 21; 33, pp. 21:12-23:9].

A candidate for any BACB certification also must agree to a Certification Processing Agreement before BACB agrees to process a certification application, which states, in part:

3. You are required to complete all requirements of BACB relating to BACB certification you are requesting or any BACB certification or credential held by you, including, but not limited to:
* * *
- Compliance with the RBT Ethics Code
* * *
9. You agree to abide by the following testing conditions:
* * *
- BACB examinations are only offered to individuals who are seeking BACB certification or recertification, and for no other purpose. You are not permitted access to BACB examinations for any other purpose, including, but not limited to:

  o Memorizing content, copying content, photographing or recording content in any medium
  o Contributing to or operating test-preparation for examination candidates
  o Contributing to or operating an "examination dump" or site or similar site designed to collect information about BACB examinations
  o Any other activity other than becoming certified by BACB

- BACB examinations and individual questions are copyright protected and highly confidential trade secrets. Any disclosure or reconstruction of test questions and content shall be a violation of BACB rules and subject to damages, including, but not limited to, the cost of replacing the compromised question(s) and reconstruction of the examination at the discretion of BACB.

[ECF Nos. 1, ¶ 22; 33, pp. 23:18-25:4].

A candidate wishing to take an online live remote proctored examination must also agree to Pearson's OnVUE policies before taking an exam. The OnVUE policies require that a candidate "understand and agree" to Pearson's Terms of Service, which state, in relevant part:

Pearson VUE grants you a limited license to access and make personal use of this site, subject to the Terms. This site and any portion hereof may not be reproduced, duplicated, copied, downloaded (other than page caching), sold, resold, visited, or otherwise exploited for any commercial purpose without the express written consent of Pearson VUE. You may not frame or utilize framing techniques to enclose any trademark, logo or other proprietary information (including images, text, page layout and form) of Pearson VUE and/or its affiliates without the express written consent of Pearson VUE.

[ECF No. 1, ¶ 24].

Defendant took the BACB RBT Certification examinations in person at a Pearson testing facility 51 times from February 6, 2018 through April 15, 2020 and failed each attempt. [ECF Nos. 1, ¶ 25; 33, pp. 28:21-23]. In April 2020, Pearson testing sites were either closed or operated at substantially reduced capacity as mandated by local authorities in response to the COVID-19 pandemic. [ECF No. 33, pp. 14:14-15:5]. The

BACB expanded options for the RBT examination to include live remote proctoring to mitigate the impact of COVID-19 on applicants. [ECF No. 33, pp. 14:21-15:5]. Live remote proctoring allows candidates to take the BACB's examinations in the privacy of their home or office with remote proctoring. *Id.*

RBT Certification examinations include a security feature known as a Dynamic Indicator Item ("DII"). [ECF No. 1, ¶ 26]. A unique DII is incorporated within each RBT examination to insert candidate-specific identifying information for security purposes (e.g., to prevent individuals taking photos of, or otherwise stealing, examination questions). *Id.* Each specific DII is a series of numbers unique to the candidate taking the particular examination. *Id.* This series of numbers is also unique to specific test characteristics (e.g., exam date, exam time, grade, score). *Id.*

Defendant took the live remote proctored RBT examination four times, ultimately achieving a passing score on her fourth remote attempt (and 55th overall attempt). [ECF Nos. 1, ¶ 28; 33, pp. 28:24-29:1]. Defendant's first live remote proctored RBT examination was on April 16, 2020 and she was administered version AB-rev of the examination, which she failed. [ECF No. 1 at ¶ 29]. Her second remote online examination was on April 23, 2020, where she was administered version AC-rev, and she failed again. *Id.* She also failed her third remote online proctored attempt, where she was administered version AB-rev, on April 30, 2020. *Id.* Defendant's fourth -- and final -- attempt took place on May

7, 2020, where she was administered version AC-rev, and passed with a 35-point increase over her score from only one week earlier. *Id.*

Defendant's examination-attempt time analysis, which compares an exam taker's response time to each question with the median response times for all candidates, revealed that she spent substantially more time than the median on most examination questions during the April 16, 2020 test, but below the median time on most of the examination questions during the May 7, 2020 test. *Id.* at ¶ 30. In other words, an analysis of her exams reveals both an increase to her score and a decrease to the amount of time she spent answering each question. *Id.*

On July 30, 2020, an informant emailed Pearson a copy of a study guide that the informant claimed was being distributed to individuals preparing to take the BACB RBT Certification examination. *Id.* at ¶ 31. Pearson forwarded the study guide to the BACB. *Id*. The BACB confirmed that the study guide consisted of 160 stolen examination questions from two active RBT Certification examination forms (AB-rev and AC-rev), both of which were taken by Defendant Rodriguez. *Id*.

The BACB found Defendant's DII in the stolen study guide provided by the informant. [ECF No. 33, p. 36:2-3]. The presence of Defendant's DII in the study guide is conclusive proof that she misappropriated or was responsible for the misappropriation and distribution of examination questions from the RBT Certification examinations that she completed between April 16, 2020 and May 7, 2020. *Id*. at 45:22-24. Defendant's theft

and dissemination of the BACB's examination questions forced the BACB to retire 160 examination questions and prepare new questions at substantial cost. *Id*. at 45:25-52:14.

C. *Plaintiffs' Complaint and Procedural History*

Plaintiffs filed their Complaint on August 3, 2021 and served Defendant with the Summons and Complaint on August 7, 2021. [ECF Nos. 1; 12]. Accordingly, the deadline for Defendant to respond to the Complaint was August 30, 2021. Defendant failed to serve any response to the Complaint.

On September 3, 2021, Plaintiffs filed a motion for a Clerks Entry of Default [ECF No. 13], which was granted the same day [ECF No. 14]. Following this, the Court issued an Order on Default Judgment Procedure, directing Plaintiffs to move for default judgment by September 27, 2021. [ECF No. 15]. Plaintiffs timely filed a Motion for Default Judgment, seeking entry of a default judgment, $144,810.00 in damages associated with developing new questions, $27,245,89 in attorneys' fees, and claimed their total damages from the case was $228,749.61.[3] [ECF No. 17].

After the Motion for Default Judgment was referred to the Undersigned [ECF No. 18], I scheduled the matter for a Zoom evidentiary hearing on January 21, 2022 so that Plaintiffs could present evidence supporting their damages request [ECF No. 19]. The hearing was attended by representatives of Plaintiffs, Plaintiffs' counsel, and -- as her

---

[3]     Even though not specifically requested in the body of Plaintiffs' motion, the damages total appears to also include "$57,013.78 in investigation-related fees." [ECF No. 17-1].

only involvement in the case -- Defendant. [ECF No. 24]. Despite taking the BACB's examinations 55 times in English [ECF No. 33, pp. 8:12-13], Defendant stated she did not speak English and required a translator.[4]

To afford Defendant an opportunity to participate, I rescheduled the hearing for February 23, 2022, and instructed Defendant that she would need to obtain a translator if she could not participate in English. [ECF No. 25]. Plaintiffs' representatives and counsel appeared for the rescheduled hearing; Defendant, however, did not. [ECF Nos. 27; 33]. I heard approximately two hours and ten minutes of testimony from Plaintiffs' representative. [ECF No. 33].

At the evidentiary hearing, the BACB's Deputy CEO, Dr. Melissa Nosik ("Dr. Nosik"), testified extensively regarding the damages caused by Rodriguez's theft. [ECF No. 33, pp. 47:2-49:24]. Dr. Nosik testified that it took the BACB approximately nine months, utilizing numerous subject matter experts ("SMEs"), to write replacement questions for the RBT Certification examinations that were compromised by Defendant's theft. *Id*. at 47:7-15. Specifically, in order to replace the test forms, the BACB needed to prepare 240 new questions to cover the topics and content necessary to certify an

---

[4]     Fortunately, the court reporter assigned to the hearing spoke Spanish and was able to translate my statement to Ms. Rodriguez. I explained the allegations against her and strongly recommended that she retain a lawyer to represent her in this matter. I further suggested that she retain a translator to appear at the next hearing so that she could follow the proceedings, as the Court could not offer her a translator.

applicant, and then pilot those questions, with 160 eventually becoming operational and included on future tests. *Id.*

Dr. Nosik testified that SME expenses associated with replacing the 160 questions that were misappropriated by Defendant totaled $145,000, which represents the monetary damages Plaintiffs seek in their Complaint. *Id.* at 49:21-24. The BACB also incurred $57,013.78 in other costs as a result of Defendant's theft. [ECF Nos. 34-1 at ¶ 8; 33, pp. 51:7-52:4]. Dr. Nosik stated that the BACB was incredibly conservative in calculating its damages and costs, and that the BACB and Pearson are not seeking any damages or costs with regard to the loss of goodwill. [ECF No. 33, p. 52:1-10].

II.   **Legal Standards**

a.   *Default Judgment*

Federal Rule of Civil Procedure 12(a)(1)(A)(i) states that a defendant has 21 days from the date of service to respond to a complaint. "When a party against whom a judgment for affirmative relief is sought has failed to plead or otherwise defend, and that failure is shown by affidavit or otherwise, the clerk must enter the party's default." Fed. R. Civ. P. 55(a). A party may then apply to the District Court for a default final judgment. Fed. R. Civ. P. 55(b)(2); *Alfa Corp. v. Alfa Mortg. Inc.*, 560 F. Supp. 2d 1166, 1173 (M.D. Ala. 2008).

A court may not enter a final default judgment based solely on the existence of a clerk's default. *Id.* at 1174. Instead, a court is required to examine the allegations to see if

they are well-pleaded and present a sufficient basis to support a default judgment on the causes of action. *Id.* (citing *Nishimatsu Constr. Co., Ltd. v. Houston Nat'l Bank*, 515 F.2d 1200, 1206 (5th Cir. 1975)). Only those factual allegations that are well-pleaded are admitted in a default judgment. *Buchanan v. Bowman*, 820 F.2d 359, 361 (11th Cir. 1987).

A court may conduct a hearing on a motion for default judgment when, in order "to enter or effectuate judgment, it needs to: (A) conduct an accounting; (B) determine the amount of damages; (C) establish the truth of any allegation by evidence; or (D) investigate any other matter." Fed. R. Civ. P. 55(b)(2); *see also Tara Prods., Inc. v. Hollywood Gadgets, Inc.*, 449 F. App'x 908, 911-12 (11th Cir. 2011) (finding that Rule 55(b)(2) "leaves the decision to hold an evidentiary hearing to the court's discretion").

   *b.  Attorney's Fees*

Typically, under the "American Rule", "each party bears its own attorney's fees." *Pedraza v. United Guar. Corp.*, 313 F.3d 1323, 1331 (11th Cir. 2002) (acknowledging "the general applicability of the American Rule regarding fee shifting, i.e., that each party bears its own attorneys' fees"); *Panama Shipping Lines, Inc. v. Ciramar Int'l Trading, Ltd.*, No. 08-21213-CIV, 2009 WL 812714, at *3 (S.D. Fla. Mar. 26, 2009) ("The American Rule stands for the proposition that "'the prevailing litigant is ordinarily not entitled to collect a reasonable attorneys' fee from the loser.'" (quoting *Alyeska Pipeline Serv. Co. v. Wilderness Soc'y*, 421 U.S. 240, 247 (1975)). Thus, "absent statute or enforceable contract, litigants pay their own attorneys' fees." *Alyeska Pipeline Serv. Co.*, 421 U.S. at 257.

The party seeking attorney's fees bears the burden of establishing entitlement via statute or enforceable contract. *Hensley v. Eckerhart*, 461 U.S. 424, 437 (1983); *see also ACLU of Ga. v. Barnes*, 168 F.3d 423, 427 (11th Cir. 1999) ("[F]ee applicant bears the burden of establishing entitlement and documenting the appropriate hours and hourly rates." (quoting *Norman v. Hous. Auth. of Montgomery*, 836 F.2d 1292, 1303 (11th Cir. 1988)). And "[b]ecause the right to attorney's fees must be found in a contract or statute, the specific text of the contractual or statutory provision granting the right is critical to determining an award of fees." *Cabrera v. Haims Motors, Inc.*, No. 17-CV-60500, 2018 WL 2455438, at *2 (S.D. Fla. June 1, 2018), report and recommendation adopted, No. 17-CIV-60500, 2018 WL 4409844 (S.D. Fla. June 19, 2018) (citing *Florida Medical Ctr. v. McCoy*, 657 So. 2d 1248, 1250 (Fla. 4th DCA 1995)).

Both the federal and Florida state statutes concerning lawsuits involving the theft of trade secrets permit an award of attorneys' fees if certain criteria are met. *See* 18 U.S.C. § 1836 (b)(3)(D); Fla. Stat. § 688.005. In a Defend Trade Secrets Act ("DTSA") claim concerning the misappropriation of a trade secret, "a court may . . . [if] the trade secret was willfully and maliciously misappropriated, award reasonable attorney's fees to the prevailing party." 18 U.S.C. § 1836(b)(3)(D). Likewise, under the Florida Uniform Trade Secrets Act ("FUTSA"), "[i]f a claim of misappropriation is made in bad faith, a motion to terminate an injunction is made or resisted in bad faith, or willful and malicious

misappropriation exists, the court may award reasonable attorney's fees to the prevailing party." Fla. Stat. § 688.005.

       *c.   Costs*

Absent a federal statute, civil procedure rule, or order to the contrary, a prevailing party is entitled to an award of its costs. Fed. R. Civ. P. 54(d)(1). The prevailing party must file a bill of costs, adhering to the guidelines outlined in Local Rule 7.3(c), which specifically references 28 U.S.C. § 1920. Under § 1920, the following costs are taxable against the losing party:

(1) Fees of the clerk and marshal;
(2) Fees for printed or electronically recorded transcripts necessarily obtained for use in the case;
(3) Fees and disbursements for printing and witnesses;
(4) Fees for exemplification and the costs of making copies of any materials where the copies are necessarily obtained for use in the case;
(5) Docket fees under section 1923 of this title;
(6) Compensation of court appointed experts, compensation of interpreters, and salaries, fees, expenses, and costs of special interpretation services under section 1828 of this title.

28 U.S.C. § 1920.

Although a prevailing party is entitled to taxable costs, the Court can still exercise discretion in awarding the costs that § 1920 enumerates. *Crawford Fitting Co. v. J.T. Gibbons, Inc.*, 482 U.S. 437, 441-42 (1987). When challenging whether costs are taxable, "the losing party bears the burden of demonstrating that a cost is not taxable, unless the knowledge regarding the proposed cost is within the exclusive knowledge of the prevailing party." *Monelus v. Tocodrian, Inc.*, 609 F. Supp. 2d 1328, 1333 (S.D. Fla. 2009)

(internal citations omitted). Nevertheless, the Court is still limited to taxing only those costs specifically authorized by statute. *E.E.O.C v. W&O, Inc.*, 213 F.3d 600, 620 (11th Cir. 2000) (citing *Crawford Fitting Co.*, 482 U.S. at 445).

### III.   Analysis

#### a.   *Default Judgment*

##### i.   Liability

Plaintiffs' first cause of action is for Copyright Infringement under 17 U.S.C. § 101 *et seq*. To show copyright infringement,  a plaintiff must establish that: 1) they own a valid copyright in the allegedly infringed work; and 2) that the defendant copied constituent elements of copyrighted work that are original. *Calhoun v. Lillenas Publ'g*, 298 F.3d 1228, 1232 (11th Cir. 2002) (citing *Feist Publications, Inc. v. Rural Tel. Serv. Co.*, 499 U.S. 340, 361, 111 S.Ct. 1282, 113 L.Ed.2d 358 (1991)).

The well-pleaded facts in Plaintiffs' Complaint establish that the BCAB examinations are original works as defined by the Copyright Act, and the BACB is the owner of all rights, including copyrights, in and to the examinations and material contained therein, and that Defendant copied constituent elements of BACB examinations that are original. [ECF No. 1, ¶¶ 31-34, 45-51]. Therefore, default judgment on this count is appropriate.

Plaintiffs' second cause of action is for Misappropriation of Trade Secrets in violation of the DTSA, 18 U.S.C. § 1836 *et seq*. Under the DTSA, a trade secret is defined

as information for which: 1) the owner thereof has taken reasonable measures to keep secret; and 2) which derives independent economic value, actual or potential, from not being generally known to, and not being readily ascertainable through proper means by, another person who can obtain economic value from the disclosure or use of the information. *M.C. Dean, Inc. v. City of Miami Beach, Fla.*, 199 F. Supp. 3d 1349, 1353 (S.D. Fla. 2016) (citing 18 U.S.C. § 1839(3)).

Under 18 U.S.C. § 1839(5), "misappropriation" means:

(A) acquisition of a trade secret of another by a person who knows or has reason to know that the trade secret was acquired by improper means; or
(B) disclosure or use of a trade secret of another without express or implied consent by a person who—
(i) used improper means to acquire knowledge of the trade secret;
(ii) at the time of disclosure or use, knew or had reason to know that the knowledge of the trade secret was—
    (I) derived from or through a person who had used improper means to acquire the trade secret;
    (II) acquired under circumstances giving rise to a duty to maintain the secrecy of the trade secret or limit the use of the trade secret; or
    (III) derived from or through a person who owed a duty to the person seeking relief to maintain the secrecy of the trade secret or limit the use of the trade secret; or
(iii) before a material change of the position of the person, knew or had reason to know that—
    (I) the trade secret was a trade secret; and
    (II) knowledge of the trade secret had been acquired by accident or mistake;
(6) the term "improper means"—
(A) includes theft, bribery, misrepresentation, breach or inducement of a breach of a duty to maintain secrecy, or espionage through electronic or other means; and
(B) does not include reverse engineering, independent derivation, or any other lawful means of acquisition[.]

18 U.S.C. § 1839(5)–(6) (alteration added).

The well-pleaded allegations of Plaintiffs' Complaint establish the following: 1) the BACB is the owner of certain proprietary information, including information in the RBT Examination; 2) the BACB has taken reasonable measures to safeguard the information included in all of the BACB Examinations, including the RBT Examination; 3) the BACB's examinations, including the RBT Examination, derive independent economic value from not being generally known to, and not being readily ascertainable through proper means by, another person who can obtain economic value from the disclosure or use of such trade secrets; 4) Defendant misappropriated the RBT Examination for her own advantage and for the advantage of others; 5) Defendant acquired the RBT Examination while knowing that the information was improperly acquired and under circumstances giving rise to a duty to maintain secrecy; and 6) this information is related to services used in interstate commerce as the BACB offers its examinations and awards certifications to successful examinees throughout the United States and internationally. [ECF No. 1, ¶¶ 53-58].

Thus, the Complaint establishes that the RBT examination meets the statutory definition of a trade secret and that Defendant misappropriated the trade secret. Therefore, default judgment should be granted on this count.

Plaintiffs' third cause of action is for Misappropriation of Trade Secrets in violation of the FUTSA, Fla. Stat. § 688.002. To prove this cause of action, Plaintiffs must establish

that: 1) they possessed the trade secrets at issue; and 2) those trade secrets were misappropriated. *Compulife Software Inc. v. Newman*, 959 F.3d 1288, 1310 (11th Cir. 2020).

Similar to the DTSA, under FUTSA,

(4) "Trade secret" means information, including a formula, pattern, compilation, program, device, method, technique, or process that:
(a) Derives independent economic value, actual or potential, from not being generally known to, and not being readily ascertainable by proper means by, other persons who can obtain economic value from its disclosure or use; and
(b) Is the subject of efforts that are reasonable under the circumstances to maintain its secrecy.

Fla. Stat. § 688.002(4).

Likewise, FUTSA's misappropriation definition mirrors the DTSA's broad scope:

a) Acquisition of a trade secret of another by a person who knows or has reason to know that the trade secret was acquired by improper means; or
(b) Disclosure or use of a trade secret of another without express or implied consent by a person who:
    1. Used improper means to acquire knowledge of the trade secret; or
    2. At the time of disclosure or use, knew or had reason to know that her or his knowledge of the trade secret was:
        a. Derived from or through a person who had utilized improper means to acquire it;
        b. Acquired under circumstances giving rise to a duty to maintain its secrecy or limit its use; or
        c. Derived from or through a person who owed a duty to the person seeking relief to maintain its secrecy or limit its use; or
    3. Before a material change of her or his position, knew or had reason to know that it was a trade secret and that knowledge of it had been acquired by accident or mistake.

Fla. Stat. § 688.002(2).

For the same reasons the well-pleaded facts of Plaintiffs' complaint were sufficient to establish misappropriation of a trade secret under DTSA, they are also sufficient to establish misappropriation of a trade secret under FUTSA. Default judgment should be granted on this count.

Plaintiffs' fourth cause of action is for Conversion. "Under Florida law, the elements of conversion are '(1) an act of dominion wrongfully asserted; (2) over another's property; and (3) inconsistent with his ownership therein.'" *Joe Hand Promotions, Inc. v. Hart*, No. 11-80971-CIV, 2012 WL 1289731, at *2 (S.D. Fla. Apr. 16, 2012) (quoting *Special Purpose v. Prime One*, 125 F. Supp. 2d 1093, 1099–1100 (S.D. Fla. 2000)).

The well-pleaded allegations of Plaintiffs' Complaint establish that 1) the BACB had possession of the examinations and questions therein and maintained a right to possess the examinations and questions therein; 2) Defendant copied the questions in a manner inconsistent with the BACB's ownership interest; 3) Defendant distributed the questions in a manner inconsistent with the BACB's ownership interest; 4) the BACB demanded Defendant return the stolen examinations and cease all further dissemination or disclosure of the stolen examinations; and 5) Defendant did not return the stolen examination questions. [ECF No. 1, ¶¶ 31-37]. Because these facts establish all necessary conversion elements, default judgment on this count is appropriate.

Plaintiffs' fifth cause of action is for Breach of Contract (The BACB). "Under Florida law, . . . to prevail in a breach of contract action, a plaintiff must prove the

following three elements: (1) the existence of a contract; (2) a breach of that contract; and (3) damages resulting from the breach." *AEGIS Syndicate 1225 at Lloyds of London v. FEDEX Custom Critical, Inc.,* No. 20-23722-CIV, 2021 WL 5014102, at *3 (S.D. Fla. June 28, 2021).

The well-pleaded allegations of Plaintiffs' Complaint establish: 1) the BACB entered into a valid and enforceable contract with Defendant dictating the terms associated with her being permitted to take the test; 2) by accepting these terms, Defendant agreed to not copy or distribute any of the test questions; 3) Defendant materially breached these contracts by stealing and disseminating BACB examination items; and 4) the BACB has suffered significant damages and harm as a result of Defendant's breach. [ECF No. 1, ¶¶ 21-22, 71-74]. Based on these factual allegations, default judgment on this count is appropriate.

Plaintiffs' sixth cause of action is for Breach of Contract (Pearson). The same elements discussed in count five also apply here.

The well-pleaded allegations of Plaintiffs' Complaint establish: 1) Pearson entered into a valid and enforceable contract with Defendant dictating the terms associated with her being permitted to take the test; 2) by accepting these terms, Defendant agreed to not copy or distribute any of the test questions; 3) Defendant materially breached these contracts by stealing and disseminating BACB examination items; and 4) Pearson has

suffered significant damages and harm as a result of Defendant's breach. [ECF No. 1, ¶¶ 24, 75-78].

Plaintiffs' seventh and final cause of action is for Tortious Interference with Prospective Economic Advantage. To state a claim for tortious interference with prospective economic advantage or business relationship, a plaintiff must show: "'(1) the existence of a business relationship, not necessarily evidenced by an enforceable contract; (2) knowledge of the relationship on the part of the defendant; (3) an intentional and unjustified interference with the relationship by the defendant; and (4) damage to the plaintiff as a result of the breach of the relationship.'" *GolTV, Inc. v. Fox Sports Latin Am., Ltd.*, No. 16-24431-CIV, 2018 WL 1393790, at *21 (S.D. Fla. Jan. 26, 2018) (quoting *Tamiami Trail Tours, Inc. v. Cotton*, 463 So. 2d 1126, 1127 (Fla. 1985)).

The well-pleaded allegations of Plaintiffs' Complaint establish: 1) the BACB has business relationships with insurers, medical, educational, and consulting practices, and government programs that place great weight on the merits of its credentialing services. The bona fide utilization of the BACB credentials by individuals for state licensing is a critical and essential part of the BACB's business activities. The BACB relies on its credibility with consumers and licensing authorities to attract professionals to attain its certification; 2) Defendant is generally aware of the BACB's reputation as an industry-leader in the behavior analyst sector and the BACB's business relationships; 3) Defendant intentionally and unjustifiably interfered with the BACB's business relationships by

compromising the integrity and meaningfulness of a BACB certification; and 4) the BACB has suffered significant damages and harm as a result of Defendant's improper actions. [ECF No. 1, ¶¶ 80-83]. These facts meet all the elements required for this cause of action and default judgment is appropriate on this count.

Accordingly, because the well-pleaded allegations support the elements for all seven counts, the Undersigned **respectfully recommends** that the District Court **grant** Plaintiffs' motion for default judgment on liability.

    ii.  <u>Damages</u>

Plaintiffs allege $144,810.00 in damages. In support of their damages claim, Plaintiffs rely on Dr. Nosik's declaration itemizing the BACB's damages [ECF No. 17-1] and her hearing testimony discussing the steps taken to remedy the harm caused by Defendant's theft [ECF No. 33]. For the reasons discussed below, the Undersigned finds that Plaintiffs have met their burden to establish damages and are entitled to the full damages request.

Even in the default judgment context, the Court "has an obligation to assure that there is a legitimate basis for any damage award it enters." *Anheuser Busch, Inc. v. Philpot*, 317 F.3d 1264, 1266 (11th Cir. 2003); *see also Adolph Coors Co. v. Movement Against Racism & the Klan*, 777 F.2d 1538, 1544 (11th Cir. 1985) (damages may be awarded on default judgment only if the record adequately reflects the basis for award). "Rather than merely telling the Court in summary fashion what its damages are, a plaintiff seeking default

judgment must show the Court what those damages are, how they are calculated, and where they come from[.]" *Perez v. Gulf Coast Mgmt. Co., LLC*, No. CIV.A. 14-00426-N, 2015 WL 895098, at *6 (S.D. Ala. Mar. 3, 2015).

A damages-seeking plaintiff can meet its evidentiary burden via "a hearing or a demonstration by detailed affidavits establishing the necessary facts." *Adolph Coors Co.*, 777 F.2d at 1544. Here, the details provided in Dr. Nosik's declaration and hearing-level testimony are sufficient to meet Plaintiffs' evidentiary burden.

In Dr. Nosik's declaration, she itemized the BACB's damages and listed the cost to replace the 160 misappropriated examination questions at $144,810.00. [ECF No. 17-1, ¶ 27]. During the evidentiary hearing, Dr. Nosik expanded on how she arrived at the figure. [ECF No. 33, pp. 47:1-49:24]. In order to replace the 160 questions that had to be removed from circulation, the BACB had to develop approximately 240 questions so that it could ensure there would be a sufficient number of operational replacement questions. *Id.* at 47:12-15.

To explain how she determined the cost of that endeavor, Dr. Nosik began by stating that the 2020 costs for the subject matter expert portion of the BACB's expenses was $386,000.00. *Id.* at 48:10-49:5. Approximately half of that was spent on RBT question development ($193,000.00). *Id.* at 49:7-17. And the BACB spent nine months (or 75% of the year) developing 240 questions, which means that 75% of the $193,000.00 was spent

24

on the questions created in response to Defendant's theft, for a total of approximately $145,000.00. *Id.* at 49:13-24.

The Undersigned finds that Plaintiffs have met their burden to establish that their damages request is based on sufficient evidence. This finding is bolstered by the fact that Plaintiffs have chosen to forgo any request for damages associated with harm to their business reputation. Omitting those damages eliminates the possibility that this final number will result in Plaintiffs' overcompensation.

Thus, based on the sufficiency of the evidence supporting Plaintiffs' damages request, the Undersigned **respectfully recommends** that the District Court award Plaintiffs $144,810.00 in damages.

b. *Attorneys' Fees*

Plaintiffs also seek attorneys' fees under the DTSA and the FUTSA. [ECF No. 34]. Under both of these statutes, prevailing plaintiffs are entitled to fees and costs if the defendant's conduct was willful and malicious. *See* 18 U.S.C. § 1836(b)(3)(D); Fla. Stat. § 688.005. Although neither the DTSA nor the FUTSA define the terms willful and malicious, "[i]n the civil context, statutes that require 'willful' behavior are generally interpreted to permit a finding of liability when the complained of behavior is 'knowing or reckless.'" *Costa v. Datapro, Inc.*, No. 10-23172-CIV, 2012 WL 591307, at *3 (S.D. Fla. Feb. 22, 2012) (stating that a discretionary award of fees was justified because counter-

defendant Costa "knowingly and intentionally misappropriated Datapro's trade secrets").

Thus, the inquiry in determining whether Plaintiffs are entitled to attorneys' fees and costs is twofold: (1) it must be determined whether Plaintiffs are the prevailing party and (2) if so, then it must be determined if Defendant's actions were willful and malicious. If both questions are answered in the positive, then Plaintiffs are entitled to attorneys' fees.

If the District Court adopts the Undersigned's recommendation that default judgment be granted in Plaintiffs' favor, then they will qualify as the prevailing party for purposes of determining entitlement to attorneys' fees. *See Jean–Louis v. Greenberg*, 2009 WL 3387484, *2 (S.D. Fla. 2009) ("[T]he entry of a default judgment against [the] [d]efendants renders [the] [p]laintiff the prevailing party.").

As to the second question -- whether Defendant's conduct was willful and malicious -- the well-pleaded allegations of Plaintiffs' complaint support answering in the affirmative. The only logical conclusion that can be made based on the evidence is that Defendant knowingly and intentionally stole the BACB's examination items and disseminated them in direct violation of the BACB's and Pearson's policies.

As detailed in the Undersigned's discussion of the factual background, Defendant had to take knowingly intentional steps (i.e., willful) to copy and distribute the stolen exam questions. Further, she took these steps after repeatedly confirming that she agreed

and understood that such actions were prohibited by the creators and distributors of the exam. Finally, she took these steps knowing that this was a test to ensure a person's competency to work in a regulated field and, by allowing possibly unqualified people to cheat on the exam and attain a passing score, Defendant harmed the reputation of the BACB and possibly put people in danger.

Because the Undersigned has found that Plaintiffs are entitled to fees, I must next determine the appropriate amount. This involves assessing the reasonableness of counsel's hourly rates and the reasonableness of the hours expended.

### i. Hourly Rate

The Supreme Court has held that a reasonable hourly rate is to be measured by prevailing market rates in the relevant community. *Blum v. Stenson*, 465 U.S. 886, 104 S.Ct. 1541, 79 L.Ed.2d 891 (1984). In determining the prevailing market rate, the court should consider several factors, including "the attorney's customary fee, the skill required to perform the legal services, the attorney's experience, reputation and ability, the time constraints involved, preclusion of other employment, contingency, the undesirability of the case, the attorney's relationship to the client, and awards in similar cases." *Mallory v. Harkness*, 923 F. Supp. 1546, 1555 (S.D. Fla. 1996) (citing *Johnson v. Georgia Highway Express, Inc.*, 488 F.2d 714, 718 (5th Cir. 1974)).

Plaintiffs seek to recover the fees for five attorneys working for two different firms. [ECF Nos. 34-2; 36-1]. Plaintiffs' primary counsel, Whiteford, Taylor, and Preston, LLP, is

located in Baltimore, Maryland and billed for three attorneys at the following hourly rates: Mr. Tiller ($621 in 2022 and $589.50 in 2021); Ms. Deng ($468.00 in 2022 and $445.50 in 2021); and Mr. Willman ($369 in 2022 and $346.50 in 2021). [ECF No. 34-2]. Plaintiffs' local counsel, Lash and Goldberg LLP, billed for two attorneys at the following hourly rates: Mr. Goldberg ($795.00); and Mr. Shiekman ($515.00). [ECF No. 36-2].

In Mr. Tiller's affidavit, he supports the hourly rates of the Whiteford, Taylor and Preston attorneys via the following lone statement:

> I am familiar with the prevailing hourly rates charged by law firms in central Maryland. Based on my firm's practice and experience in central Maryland, the hourly rates charged to the BACB in this matter are fair and reasonable as compared to rates charged by other law firms of like size, skill, and practice in central Maryland.

[ECF No. 34-2].

This is problematic for two reasons: (1) it offers no insight into the reputation, skill, or background of any of the timekeepers; and (2) it bases its reasonable hourly rate on the *Maryland* market, not the market relevant to this dispute -- Miami. *Am. C.L. Union of Georgia v. Barnes*, 168 F.3d 423, 437 (11th Cir. 1999) ("The general rule is that the 'relevant market' for purposes of determining the reasonable hourly rate for an attorney's services is 'the place where the case is filed.'" (quoting *Cullens v. Georgia Dep't. of Transp.*, 29 F.3d 1489, 1494 (11th Cir. 1994)).

Mr. Goldberg's affidavit offers a similarly conclusory justification for Lash and Goldberg's requested hourly rates: "Based on my practice and experience in South

Florida, the hourly rates charged to BACB in this matter are fair and reasonable." [ECF No. 36-2]. Just like Mr. Tiller's affidavit, Mr. Goldberg's grounds for his fee request fail to offer any insight into the reputation, skill, or background of any of the timekeepers.

At bottom, these affidavits are deficient. As stated by the Eleventh Circuit:

> The applicant bears the burden of producing satisfactory evidence that the requested rate is in line with prevailing market rates. *NAACP v. City of Evergreen*, 812 F.2d at 1338. Satisfactory evidence at a minimum is more than the affidavit of the attorney performing the work. *Blum*, 465 U.S. at 896 n. 11, 104 S.Ct. at 1547 n. 11. It should also be noted that in line with the goal of obtaining objectivity, satisfactory evidence necessarily must speak to rates actually billed and paid in similar lawsuits. Testimony that a given fee is reasonable is therefore unsatisfactory evidence of market rate. *See Hensley*, 461 U.S. at 439 n. 15, 103 S.Ct. at 1943 n. 15. Evidence of rates may be adduced through direct evidence of charges by lawyers under similar circumstances or by opinion evidence.

*Norman*, 836 F.2d at 1299.

Plaintiffs could have presented additional evidence supporting the hourly rates of their attorneys. For example, they could have attached judicial opinions supporting their requested hourly rates. Or, they could have attached the individual attorneys' *curriculum vitae* expanding on their experience, education, and background. Or, they could have included an affidavit from another attorney explaining why the proposed hourly rates are reasonable. However, Plaintiffs chose, instead, to offer only a conclusory statement in the form of an affidavit from the very attorney performing the work, saying that the fees are reasonable.

When the submitted "documentation is insufficient," a district court's "decision regarding the appropriate hourly rate may be made by . . . relying upon the court's expertise." *Valley v. Ocean Sky Limo*, 82 F. Supp. 3d 1321, 1326 (S.D. Fla. 2015).

In a recent decision, now-Chief United States Magistrate Judge Edwin G Torres found it appropriate to reduce from $450 to $400 the hourly rate requested by an attorney with 31 years of experience, who graduated from the University of Pennsylvania Law School, litigated approximately thirty-three cases to verdict, and whose legal positions resulted in approximately twenty published decisions. *Rodriguez v. Supersonic of Fla., Inc.*, No. 20-23459-CIV, 2021 WL 965937, at *3 (S.D. Fla. Feb. 26, 2021), report and recommendation adopted, No. 20-23459-CIV, 2021 WL 965747 (S.D. Fla. Mar. 15, 2021). In reaching that conclusion, Judge Torres noted that the attorney was an "accomplished lawyer" but disagreed with the hourly rate, in part, because "the result was merely a default judgment." *Id.* at *3.

The only relevant information revealed by the two affidavits is Mr. Tiller is a partner at his firm and Mr. Shiekman is a senior associate at his. The affidavits are silent as to anyone's experience and to the titles of Mr. Goldberg,[5] Ms. Deng, and Mr. Willman

---

[5]     The Undersigned could assume that Mr. Goldberg is a partner at Lash & Goldberg LLP based on the last name and the difference in his hourly rate from Mr. Shiekman's. The Undersigned is familiar with Mr. Goldberg, given that I have practiced law in South Florida since 1983. However, I am not familiar with the specifics of his background and training. I am also not familiar with Mr. Shiekman. Because it is Plaintiffs' burden to prove the reasonableness of their attorney's hourly billing rate, the Undersigned chooses not to engage in speculative leaps when it would have been very easy to include the

hold within their firms. Because the case resulted in a default judgment against a pro se Defendant and Plaintiffs have failed to present any meaningful evidence supporting their requested hourly rate, the Undersigned finds that reductions are appropriate: Mr. Tiller ($400 an hour); Ms. Deng ($300 an hour); Mr. Willman ($300 an hour); Mr. Goldberg ($400 an hour); and Mr. Shiekman ($300 an hour).

ii.   Reasonable Hours

After determining the reasonable hourly rate, courts must then determine the number of hours reasonably expended on the litigation. In submitting a fee petition, counsel must exercise proper billing judgment and thus exclude any hours that are "excessive, redundant, or otherwise unnecessary." *Hensley*, 461 U.S. at 434; *Norman*, 836 F.2d at 1301. Further, if a court determines that the number of hours is unreasonably high, then "[t]he district court may attempt to identify specific hours that should be eliminated, or it may simply reduce the award to account for the limited success. The court necessarily has discretion in making this equitable judgment." *Hensley*, 461 U.S. at 436–37; *see also Loranger v. Stierheim*, 10 F.3d 776, 783 (11th Cir. 1994) (approving across-the-board percentage cut to either the total number of hours claimed or to the lodestar amount).

Counsel's submitted timesheets are problematic. There are multiple entries which reflect poor billing judgment and seek to recover fees for work that is clerical, related to

information in the signed affidavit so that there was no uncertainty.

other cases, redundant, and unnecessary. Moreover, the entries concerning exclusively compensable work are often grouped together in a block billing format, which leaves the Court unable to assess the reasonableness of the time spent on any particular task.

"Work performed which can often be accomplished by non-lawyers but which a lawyer may do . . . is not compensable at a lawyer's rate solely because a lawyer does it." *Machado v. Da Vittorio, LLC*, No. 09-23069, 2010 WL 2949618, at *3 (S.D. Fla. July 26, 2010) (internal quotations omitted) "The focus of the inquiry is whether the work is traditionally performed by attorneys." *Id*. "Clerical work such as the compilation of facts and statistics, coordinating schedules, basic communications, procedural matters, and housekeeping matters, is usually performed by legal assistants, not lawyers." *Id*.

Examples of the clerical tasks for which Plaintiffs seek to recover attorneys' fees include: (1) a 1/17/22 billing for "creat[ing] folder and compil[ing] exhibits for use [at] 1/21 evidentiary hearing" [ECF No. 34-2]; (2) a 9/27/21 billing for "send[ing] packet to local counsel for filing" [ECF No. 34-2]; and (3) a 4/28/22 billing entry for "arrang[ing] time to call back with translator" [ECF No. 36-1]. Attorneys cannot recover fees for handling this type of non-legal, clerical work.

Plaintiffs previously submitted billing records as part of their motion for a default judgment. [ECF No. 17-2]. Because that submission contained entries that were either redacted or clearly unrelated to the instant case, the Undersigned instructed Plaintiffs to resubmit unredacted versions of their billing records and explain whether they had

previously sought fees for work done on other cases. [ECF No. 19]. Despite this Order, the attached billing records still contain concerning entries.

Although Plaintiffs added an additional column identifying the hours of an entry attributable to this case, at times, this allocation does not make sense. For example, in a 7/12/21 entry, Plaintiffs attributed to this case .2 hours of a .8-hour entry for "Analyze comments to Elivirez Complaint and Analyze Pearson TS & CS; Prepare Elivirez Complaint." [ECF No. 34-2]. This entry appears to exclusively concern **another** case. Further, in another entry on 8/11/21, Plaintiffs attributed to this case .1 hours of a .2-hour entry for "Review Letter from Court Clerk re Pro Hac Vice." [ECF No. 34-2]. In this case, Plaintiffs did not even file a pro hac vice motion until 8/17/21. [ECF Nos. 7; 10]. Thus, the Undersigned does not see how reviewing this single letter could relate to this case and, even if it did, why only a portion of the review would relate to this case.

Finally, the submitted timesheets contain multiple examples of redundant and unnecessary expenditures of time. The amount of time spent preparing and reviewing the attorney fee motions provides ample illustration of poor billing judgment.

Between the five attorneys either drafting, reviewing, or editing the attorneys' fees motions, Plaintiffs spent at least 31.6 hours of attorney time in preparing a motion and supplemental motion for attorneys' fees. [ECF Nos. 34-2; 34-3; 36-1; 36-2]. This is not a reasonable use of time. The motions and declarations are relatively straightforward and extremely similar to each other. Further, Tiller's declaration and attached invoice are

nearly identical to an earlier-submitted declaration and invoice as part of Plaintiffs'
Default Judgment Motion. *Compare* [ECF No. 17-2] *with* [ECF No. 34-2]. Finally, much of
the additional work appears to be the product of counsel's initial failure to separate its
fees between the cases.

These problems are compounded by counsel's frequent use of block billing. The
party seeking an attorneys' fee award must produce "meticulous, contemporaneous time
records that reveal, for each lawyer whose fees are sought, all hours for which
compensation is requested and how those hours were allotted to specific tasks." *Simon v.
Leaderscape, LLC*, 565 F. Supp. 2d 1332, 1335 (S.D. Fla. 2008). A movant fails to meet that
burden when it submits to the court "block billing" time entries – i.e., the practice of
"lumping together multiple tasks into a single entry of time," *Cardena v. Pacesetter Corp.*,
224 F.3d 1203, 1214 (10th Cir. 2000), "without separating the tasks into individual blocks
or elaborating on the amount of time each task took." *Capone v. Aetna Life Ins. Co.*, 2010
WL 6029242, at *5 (N.D. Ga. Dec. 22, 2010).

The following excerpts from Plaintiffs' counsel's timesheets provide an illustration
of this practice:

| 09/24/21 | TRW | LEGAL RESEARCH FOR AFFIDAVIT IN SUPPORT OF MOTION FOR DEFAULT JUDGMENT; DRAFT NOSIK AFFIDAVIT IN SUPPORT OF MOTION FOR DEFAULT JUDGMENT; DRAFT PROPOSED ORDER; DRAFT MOTION FOR DEFAULT AND SEND TO S TILLER FOR REVIEW | 6.3 |

| 09/27/21 | TRW | CALCULATE TOTAL AMOUNT OF DAMAGES; FINAL EDITS TO MOTION FOR DEFAULT PACKAGE AND SUPPORTING DECLARATIONS; COMPILE, CREATE, AND REDACT EXHIBITS; SEND PACKET TO LOCAL COUNSEL FOR FILING; EMAIL PROPOSED ORDER TO COURT PER COURT'S ORDER | 3.5 |
| 00/25/21 | BRS | Revised draft motion for default final judgment against defendant Vera Rodriguez; revise draft affidavit in support of motion for default final judgment against defendant Vera Rodriguez; revise draft proposed order granting motion for default final judgment against defendant Vera Rodriguez; email Steven Tiller regarding revisions to motion support documents for motion for default final judgment against defendant Vera Rodriguez; research local rules for conferring with party who has defaulted | 2.2 |

Block billing is impermissible because it frustrates the Court's ability to determine which portion of the fees billed at a particular time are recoverable. *See Filippova v. Mogilevsky*, 2019 WL 1216166, at *6 (S.D. Fla. Feb. 19, 2019) (collecting cases). To deal with this type of situation, the Eleventh Circuit has approved the use by district courts of an across-the-board reduction to address block billing. *See Ceres Env't Servs., Inc. v. Colonel McCrary Trucking*, LLC, 476 F. App'x 198, 203 (11th Cir. 2012) (district court did not abuse discretion by applying 10% reduction to address block billing); *see also Oravec v. Sunny Isles Luxury Ventures L.C.*, No. 04-22780-CIV, 2010 WL 1302914, at *13 (S.D. Fla. 2010) (applying a 25% across-the-board reduction to account for block billing); *Lil' Joe Wein*

*Music, Inc. v. Jackson*, No. 06-20079-CIV, 2008 WL 2688117, at *13 (S.D. Fla. June 28, 2008) (applying a 25% cut because of block billing); *McBride v. Legacy Components, LLC*, No. 8:15-cv-1983, 2018 WL 4381181, at *3 (M.D. Fla. Aug. 30, 2018) (reducing billable hours by 35% based on block-billed time entries).

The above examples are only illustrative of the issues in Plaintiffs' time sheets. These issues repeat themselves throughout nearly the entirety of Plaintiffs' counsel's records and impact a significant number of entries. Because of that, the Undersigned finds that a 30% across-the-board reduction is appropriate.

      iii.  <u>Conclusion</u>

Applying the Undersigned's reduced hourly rates and reduced hours results in the following award:

| Timekeeper | Original Time Billed | Reduced Time | Adjusted Rate | Total |
|---|---|---|---|---|
| BRS | 16.7 | 11.69 | $300 | $3,507.00 |
| DD | 1.2 | .84 | $300 | $252.00 |
| MBG | 6.00 | 4.2 | $400 | $1,680.00 |
| SET | 43.9 | 30.73 | $400 | $12,292.00 |
| TRW | 76.6 | 53.62 | $300 | $16,086.00 |
| TOTAL | | | | **$33,817.00** |

Therefore, the Undersigned respectfully recommends that the District Court grant in part Plaintiffs' request for attorney's fees and award them $33,817.00 ($32,789.36 less than the requested amount).

      *c.*  *Costs*

Plaintiffs also seek $57,013.78 in costs "incurred retaining Nathans Investigations, LLC to investigate the nature and scope of the harm and damages incurred by the BACB as a result of [Defendant's] theft." [ECF No. 34]. Plaintiffs offer the DTSA, FUTSA, and Federal Rule of Civil Procedure 54(d)(1) as legal support for their costs request. *Id.*

The DTSA and FUTSA are inapplicable because although Plaintiffs' Motion includes a subheading titled "Plaintiffs are Entitled to Attorneys' Fees and Costs under the DTSA and the FUTSA," the body of the motion references no provision within either of those two statutes which references *costs*. Indeed, the specific provisions cited (and arguments made) refer exclusively to awarding attorney's fees.

In fact, Plaintiffs only costs-specific legal citation is Federal Rule of Civil Procedure 54(d)(1), which they cite for the proposition that "[u]nless a federal statute, these rules, or a court order provides otherwise, costs--other than attorney's fees--should be allowed to the prevailing party." [ECF No. 34].

There are myriad issues with Plaintiffs' request. First, it does not comply with the Local Rules. The rule to which Plaintiffs cite refers to *taxable* costs, which are limited by 28 U.S.C. § 1920. *Herrera v. 7R Charter Ltd.*, No. 1:16-CV-24031, 2021 WL 7451022, at *2 (S.D. Fla. Dec. 29, 2021), report and recommendation adopted, No. 16-CIV-24031, 2022 WL 767106 (S.D. Fla. Mar. 14, 2022) ("Section 1920 'defines the term 'costs' as used in Rule 54(d) and enumerates expenses that a federal court may tax as costs under the discretionary authority found in Rule 54(d).'" (quoting *Crawford Fitting Co. v. J.T. Gibbons,*

*Inc.*, 482 U.S. 437 (1987))). Motions for taxable costs are to be filed in accordance with Local Rule 7.3(c), which requires, among other things, parties to use form AO 133 of the Administrative Office of the United States Courts and to be supported by a memorandum of law. S.D. Fla. L.R. 7.3(c).

If Plaintiffs are moving for this award as a non-taxable cost (which seems to be the more likely scenario), then there is another issue: Plaintiffs have submitted no authority supporting the award to the prevailing party costs spent investigating the underlying facts of the case. This alone is an independent basis for declining to grant Plaintiffs' request. *Romano v. John Hancock Life Ins. Co. (USA)*, No. 19-21147-CIV, 2022 WL 1447733, at *31 (S.D. Fla. May 9, 2022) ("A litigant who fails to press a point by supporting it with pertinent authority, or by showing why it is sound despite a lack of supporting authority or in the face of contrary authority, forfeits the point. The court will not do his research for him." (quoting *Phillips v. Hillcrest Med. Ctr.*, 244 F.3d 790, 800 n.10 (10th Cir. 2001))).

Moreover, this District is replete with decisions rejecting requests to award the type of costs Plaintiffs seek to recover. *See AMG Trade & Distribution, LLC v. Nissan N. Am., Inc.*, No. 18-CV-60062, 2021 WL 1146607, at *7 (S.D. Fla. Feb. 26, 2021), report and recommendation adopted, No. 18-CV-60062, 2021 WL 1146352 (S.D. Fla. Mar. 25, 2021) (section 1920 "does not authorize recovery for fees associated with an investigator"); *Abby v. Paige*, No. 10-23589-CIV, 2013 WL 12246348, at *10 (S.D. Fla. Aug. 2, 2013), report and recommendation adopted, No. 10-23589-CIV, 2013 WL 12246349 (S.D. Fla. Oct. 1, 2013)

(denying investigative costs under § 1920); *Zelaya v. Bartholomai*, No. 02-22552-CIV, 2007 WL 9652960, at *5 (S.D. Fla. Aug. 9, 2007), report and recommendation adopted, No. 02-22552-CIV, 2008 WL 11333727 (S.D. Fla. Feb. 11, 2008) ("Costs of an investigator are not taxable under 28 U.S.C. § 1920.").

Accordingly, the Undersigned respectfully recommends that the District Court **deny** Plaintiffs' request for $57,013.78 in costs.[6]

### IV.   Conclusion

For the reasons stated above, the Undersigned **respectfully recommends** that the District Court **grant** Plaintiffs' Motion for Default Judgment and award them $144,810.00 in damages. Further, the Undersigned **respectfully recommends** that the District Court **grant in part** Plaintiffs' request for attorneys' fees and award them $33,817.00 ($32,789.36 less than the requested amount). Finally, the Undersigned **respectfully recommends** that the District Court **deny** Plaintiffs' request for costs.

### V.   Objections

---

[6]     The invoices submitted by Plaintiffs and the proposed Report and Recommendations seem to indicate that there are other costs associated with prosecuting this action which Plaintiffs would like to recover. [ECF Nos. 36, p. 2 n.3 ("Plaintiffs' Motion for Attorneys' Fees and Costs included a request for the additional amounts incurred beyond serving the draft motion on Defendant Rodriguez."); 37 ("Additionally, Plaintiffs incurred $29.88 in costs related to their Motion for Attorneys' Fees and Costs, which were reasonable and necessary to effectuate service upon Defendant Rodriguez." (citing ECF No. 36))]. However, Plaintiffs did not specifically request any additional separate costs within the body of either motion. *See Phillips*, 244 F.3d at 800 n.10. Thus, the Undersigned declines to address whether any of these costs are recoverable.

The parties will have fourteen (14) days from the date of being served with a copy of this Report and Recommendations within which to file written objections, if any, with United States District Judge Robert N. Scola. Each party may file a response to the other party's objection within fourteen (14) days of the objection. Failure to file objections timely shall bar the parties from a *de novo* determination by the District Judge of an issue covered in the Report and shall bar the parties from attacking on appeal unobjected-to factual and legal conclusions contained in this Report except upon grounds of plain error if necessary in the interest of justice. *See* 28 U.S.C. § 636(b)(1); *Thomas v. Arn*, 474 U.S. 140, 149 (1985); *Henley v. Johnson*, 885 F.2d 790, 794 (11th Cir. 1989); 11th Cir. R. 3-1 (2016).

**RESPECTFULLY RECOMMENDED**, in Chambers, in Miami, Florida, on July 29, 2022.

Jonathan Goodman
UNITED STATES MAGISTRATE JUDGE

**Copies furnished to:**
The Honorable Robert N. Scola
All counsel of record

Evelyn Vera Rodriguez, Pro Se
3115 SW 69th Ave
Miami, FL 33155